[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 119 
After the plea of not guilty had been entered, and the trial moved by the district attorney, the counsel for the prisoner made a motion to quash the indictment, because,
1. It did not appear, on the face of the indictment, that it was found or presented by a grand jury.
2. Because it did not appear, on its face, that it was found and presented by the requisite number of grand jurors.
3. Because it was not alleged, in the indictment, that the grand jury were charged and sworn by the Court of Sessions *Page 120 
to inquire for the people of the State of New York, and for the body of the county of Cortland.
These and similar objections are frequently made to the form of an indictment, and it is, therefore, proper to consider, in the first place, what constitutes a valid presentment of a grand jury.
We have inherited, from England, many technical rules relating to criminal practice which have long since become obsolete. They had their origin in that period of English history when the most trivial offense was punishable with death, and when it was almost a foregone conclusion if the sword of justice was drawn that it must be returned bathed in blood. It is not to be wondered at that humane judges should have been found, in such an age, willing to save life by attaching importance to objections, purely technical, to the form of the indictment which placed the accused on trial. An advanced civilization, and a more humane administration of the law, have removed the causes which gave rise to these technical rules, and there is, therefore, no good reason for retaining them. Ratione cessante, lex ipsa cessat. So thought our legislature when it passed the statute of jeofails, and enacted that "no indictment should be deemed invalid by reason of the omission of the defendant's title or occupation, or by a misstatement of them, or of the town or county of his residence, where the defendant shall not be prejudiced thereby," or by an omission of the words "with force and arms," or words of similar import, or by an omission to charge any offense to have been committed contrary to statute, or by reason of any other defect or imperfection in matters of form, which shall not tend to the prejudice of the defendant.
This statute swept away many of the objections to the forms of indictments, which at times seriously interfered with an effective administration of criminal justice. A more liberal practice began to prevail at an early day in England. BACON says: "Some indictments have been quashed for an omission of the names of jurors, others for the want of the words good and lawfulmen, and others for want of the words *Page 121 and then and there sworn and charged, and others for want of the words to inquire for the king and for the body of thecounty; yet of late years exceptions of this kind have not been much favored, especially if the indictment were in a superior court, and that which is omitted be in common understandingimplied in what is expressed." (Bacon's Ab. I, "Indictment.")
This is a sound rule, and one that it is safe to follow. It does not deprive an accused party of a fair trial on the merits, nor does it on the other hand open an easy door for an escape on technical grounds. Applying this rule, the form of this indictment should be considered good, if the omissions complained of are, in common understanding, implied in that which is expressed.
That part of the indictment which is complained of as defective is as follows:
"COURT OF SESSIONS, | Cortland County, ss:
"CORTLAND COUNTY, |
"The jurors of the people of the State of New York, in and for the body of the county of Cortland, upon their oaths present."
Then follow apt words charging the defendant with the commission of a larceny. Here are all the requisites of a goodcommencement to an indictment. It plainly appears to have been found in the Court of Sessions for the county of Cortland, and by the jurors of the people for said county. It is true that it does not allege that it was found by a grand jury, or by the legalnumber of grand jurors, but these are plainly implied, because that body, legally constituted, alone have the power to present any one for trial. This has been frequently decided. (McClure
v. The State, 1 Yerg. 206, per CATRON, J.)
The form of this indictment is identical, mutatis mutandis,
with that long since adopted in England, and which has obtained in most of the States in our own country. The form used in England nearly three hundred years ago, was "juratores prodomina regina presentant quod," etc. (West's *Page 122 
Symboleography, part 2, p. 96), and it has been continued without exception to the present day. A great deal of confusion, however, exists in the books, because the distinction between thecommencement and the caption of an indictment which has always existed in England, has not uniformly been maintained here. "The whole question as to what a caption should contain," says Bishop, in his treatise on Criminal Procedure (§ 154), "appears, when approached through the American books, draped in mist and girded about with darkness." Observing the proper distinction between the caption and the commencement of an indictment, no valid objection will be found to the one in this case. The caption is no part of the indictment. It consists wholly of the history of the proceedings when an indictment is removed from an inferior to a superior court. As I have already stated, the form of an indictment in many of our own States, and which form is derived from England, is thus: "The jurors of the people of the State of ____, in and for the body of the county of ____, upon their oath present," etc. This is the commencement and all that it need contain. The caption is quite a different matter, and it had its origin in this way. Where an inferior court, in obedience to the mandate of the King's Bench, transmitted the indictment to the crown office, it was accompanied with its history, naming the court where it was found, the jurors' names by whom found, and the time andplace where found. All this was entered of record by the clerk of the superior court immediately before the indictment, and was called the caption, but it was no part of the indictment itself. (Bishop on Cr. Pro. vol. 1, §§ 145-6; 1 Starkie's Cr. Pl. [2d ed.] 233.) A complete form of the caption is given in Hales' P.C. 165, and in 1 Chitty's Cr. Law, 327.
This same practice prevailed in our State when indictments were removed from the Sessions to the Supreme Court, as will be seen in the case of The People v. Guernsey (3 Johns. Cases, 266), quoted by the respondents.
It often occurred that these captions were defective in the statement of facts sufficient to show that the inferior courts *Page 123 
where they were found had jurisdiction. Then followed a motion in arrest of judgment, and decisions as to the requisites of a caption, viz., that it should contain an averment that the indictment, to which it was prefixed, was found by a grand
jury of good and lawful men, giving their names, and that they had been then and there sworn and charged, etc., etc. (Vide
Bishop's Cr. Pro. § 155, vol. 1, note 1.) The same doctrine is aptly stated in Burn's Justice, vol. 3, p. 372, in these words: "The caption of the indictment is no part of the indictment itself (2 Hale, 166), but is the style or preamble or return that is made from an inferior court to a superior, from whence acertiorari issues to remove; or when the whole record is made up in form; for the record of the indictment, as it stands upon the file in the court where it is taken, is only thus: Thejurors, for our lord, the king, upon their oath, present:" The difficulty in our practice has grown out of the error of regarding these decisions as furnishing a test of what the indictment itself should contain, rather than its caption, when removed to a superior court. The consequence is that, in some of the States, there have been introduced into the commencement of an indictment the averments necessary to make a good caption, thus confounding the two. (Bishop's Cr. Pro. § 149, note 2.) This has led to great diversity of practice and necessary confusion, and it will be readily seen that the decisions of such States upon these questions have no application here, for the English practice has been adopted in our own State. (Barb. Cr. Treatise, 280.)
So far, therefore, as the objections in this case go to the form of the indictment, the latter must be considered good. Should an indictment be found in an improper manner, or by an insufficient number of jurors, the way is open for redress by motion, which secures to the accused party immunity from an illegal trial or punishment. (State v. Batchelor,15 Mass. 207, 208; Reg v. Hearne, 9 Cox C.C. 433, 436; 10 Jurist [N.S.] 724; 32 Blackstone, 238; Bishop's C.P. § 448.)
I pass to the consideration of the other questions arising in this case. *Page 124 
To constitute a good indictment for larceny, the thing stolen must be charged to be the property of the actual owner, or of a person having a special property as bailee, and from whose possession it was stolen. (2 Arch. C.P. [7th ed.] 257.) Gates was neither the actual owner nor the bailee of the property stolen, and the first count in the indictment, therefore, is bad. He was employed by the county superintendent of the poor of Cortland county at a salary. The last named officer is clothed by statute with the power "to employ suitable persons to be keepers of the poor-houses." (2 Rev. Stat. [5th ed.] 841, § 34.) And it was under this power that Gates was employed. The superintendent is, by the same statute, authorized "to purchase materials" for the support of the paupers.
It is true that in this instance the keeper purchased the property stolen with his own money; but it was an advance made for the superintendent, and he was by him subsequently, and before the larceny, reimbursed.
Neither was Gates in the actual possession of the property so as to have a special property therein. The character of his possession depends upon the tenure by which he held the property. If he were the mere servant of the actual owner, the possession was in such owner, not in him. If he were the servant, then the distinction between the charge and the possession of the property must not be overlooked. This distinction, though in ordinary language lost sight of, is necessary to be observed in dealing with the question under consideration. While no man is so high as to be above the reach of the law, no one is so low as to be beneath its protection. It is necessary, therefore, that we should observe critical distinctions in charging a man with a crime, lest his life or liberty be placed twice in jeopardy. And such a case might arise if the defendant were again indicted for the same larceny, alleging the property to be in the master. While, therefore, in the popular use of the terms, the servant is said to be in possession of the master's property, yet in contemplation of law he has the charge only. In this case Gates could have been removed at the mere caprice of the superintendent, *Page 125 
and his possession of the property was not such that he could have maintained a civil action for it against the thief. Indeed, if he had taken the property in the manner and with the design with which the thief did, he could have been convicted of a larceny. (Coates v. The People, 4 Parker, 662.)
Chitty thus states the rule: "It is a clear maxim of the common law that where one has only the bare charge or custody of the goods of another, the legal possession remains in the owner, and the party may be guilty of trespass and larceny in fraudulently converting the same to his own use. Thus, a butler may commit larceny of plate in his custody, or a shepherd of sheep. The same of a servant intrusted to sell goods in a shop. This rule appears to hold universally in the case of servants, whose possession of their master's goods by their delivery or permission is the possession of the master himself." (Vide 1 Denio, 123, and cases there cited.)
Adopting this as the rule, what practical distinction can be drawn between the relations which the butler, the shepherd, and the servant intrusted to sell goods, and their respective masters, and that which Gates bore to the superintendent who employed him? The position, therefore, that, as a mere servant, the possession of Gates was sufficient to support the allegation in the indictment, cannot be maintained. (Dillenbach v.Jerome, 7 Cow. 294; Commonwealth v. Morse, 14 Mass. 217.)
There is another class of cases involving the possession of property, much relied upon on the argument, which it is necessary to notice. They are cases where the question arose as betweenmaster and servant, where the servant was indicted for stealing from the master, and where the property stolen, though received by the servant for the master's use, had neveractually passed from the latter to the former. The rule in such a case is, "that if the servant has done no act to determine his original, lawful and exclusive possession, as by depositing the goods in his master's house, or the like; although for many purposes, and as against third persons, this is in law a receipt of the goods by the master, yet it has been held otherwise in respect of the servant himself upon a *Page 126 
charge of larceny at common law, in converting the goods to his own use. (2 Russ. on Crimes [4th ed.] 401; 2 East. P.C. 568.) This rule has no application to the case under consideration.
In the second count, the property was alleged to be in the county of Cortland, and it is argued that it is bad for that reason. It is claimed that the property was vested in the superintendent of the poor as a body corporate, and that even if it were the property of the county, such property should have been alleged to be in the board of supervisors. To establish this latter proposition, the act is quoted which provides that "all acts and proceedings by and against a county in its corporate capacity, shall be in the name of the board of supervisors of such county." (1 R.S. [5th ed.] 846, § 3.) Notwithstanding this statute, the board of supervisors, as such, possess no corporate powers. (Brady v. The Supervisors of New York, 2 Sand. S.C. 460.) The county is made a corporation by statute. (1 R.S. [5th ed.] 846, § 1; Brady v. Supervisors, supra); and amongst its corporate powers is the right to purchase and hold such personal property as may be necessary to execute its corporate or administrative powers. (§ 1 subd. 3.) The statute designating the name in which legal proceedings by and against the county should be conducted, was designed to simplify and lessen the expenses of litigation, and not to change the title of the corporation, or the name in which its property should be held.
Instances of similar legislation are not wanting. Actions by and against banks formed under the general banking law, may be by or against the president thereof. (2 R.S. [5th ed.] p. 560, §§ 194, 195.) And a joint stock company or association may sue and be sued in the name of its president or treasurer for the time being. (3 R.S. [5th ed.] 777.)
But it is contended that the title to the property stolen was vested in the superintendent of the poor as a corporate body, he having purchased the same, in his name, for county purposes, and that it should have been so laid in the indictment. This position cannot be maintained. The office of *Page 127 
superintendent of the poor, although invested with corporate powers, is a mere agency of the county. The person who fills the office is required to give a bond to the supervisors for the faithful discharge of his duty, and is authorized to draw, from time to time, on the county treasurer for all necessary expenses incurred in the discharge of his trust. This creates the relation of principal and agent, and in no sense can the property bought by this officer be regarded as his. Considering, however, the nature of his office, he might be regarded as having a special property in the things stolen, so as to have made it proper to allege the property as belonging to him, but, at all events, it was the property belonging to the county of Cortland, and it was proper so to charge it.
My conclusion, therefore, is, that the second count of the indictment is good, and that the judgment should be reversed.